1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

United States of America,

           Plaintiff,

   v.

George Orville Turner, Jr.,

           Defendant.

Case No. 2:21-cr-00013-KJD-BNW

**REPORT AND RECOMMENDATION**

**I.    Introduction**

    Before the Court is Defendant Turner's motion to suppress. ECF No. 42. The government opposed the motion (ECF No. 46), and Turner replied (ECF No. 47). The Court held an evidentiary hearing on October 19, 2021. ECF No. 51.

    The basic facts of the case are as follows: A Las Vegas Metropolitan Police Department (LVMPD) officer, Officer Jex, observed certain concerning material on the Facebook account of "Kizzy Chapo." This material appeared to demonstrate that the owner of the Kizzy Chapo account was selling fake licenses and identification cards. Officer Jex also had reason to believe that the "Kizzy Chapo" account was associated with another account with the username "George Turner." Officer Jex applied for a search warrant for both the Kizzy Chapo and George Turner Facebook accounts. A state court judge authorized this warrant (the Facebook Warrant).

    Officer Jex executed the Facebook Warrant and reviewed the seized material. Officer Jex discovered information which led him to believe that George Turner (1) operated both Facebook accounts; and (2) was engaged in forging licenses and identification cards, was a felon who may be in possession of a firearm, and was selling narcotics. Based on this information, Officer Jex obtained a second warrant to search Turner's home (the Residential Warrant). The Residential Warrant authorized Officer Jex to seize several categories of items, including forgery-related evidence, narcotics, firearms, and ammunition.

1    Police executed the Residential Warrant and seized several pieces of evidence including a

2    firearm and ammunition. Turner was then charged with being a felon in possession of a firearm

3    and a felon in possession of ammunition.

4    Now, Turner seeks to suppress the firearm and ammunition. Regarding the Facebook

5    Warrant, Turner argues that there was no probable cause to obtain this warrant, and the warrant

6    was overbroad because it was not limited to seizing forgery-related evidence. Regarding the

7    Residential Warrant, Turner argues that it was invalid because it was based on evidence obtained

8    from the invalid Facebook Warrant, and the police lacked probable cause to search for the

9    firearm. The government responds that the Facebook Warrant was supported by probable cause

10   and was not overbroad but rather limited to identity and forgery-related evidence. The

11   government further argues that the firearm-related evidence obtained from the Facebook Warrant

12   could be seized based on the plain view doctrine. Accordingly, the government argues that there

13   was probable cause to search Turner's home for firearms and ammunition. The government

14   continues by arguing that even if there was no probable cause to search Turner's home for

15   firearms, the good faith exception applies (such that police could rely on the Residential Warrant,

16   which allowed them to search for firearms and ammunition). And, even if the good faith

17   exception did not apply, officers would have inevitably discovered the firearm and ammunition in

18   Turner's home while otherwise lawfully searching it. Accordingly, the government argues that

19   the firearm and ammunition should not be suppressed.

20   Having reviewed the parties' briefs, the search warrants at issue, the parties' oral

21   arguments, and the law, the Court recommends that Defendant's motion to suppress be granted.

22   In support of this recommendation, the Court summarizes the evidence, provides the parties'

23   arguments, and analyzes the facts under the applicable law.

24   **II.    Background**

25   Officer Logan Thomas Jex testified that he is an officer with LVMPD. He created an

26   undercover Facebook account in February of 2020. At some point, he became friends with

27   someone who had an account named "Kizzy Chapo." Based on what he observed on Kizzy

28

Chapo's account, he applied for a search warrant and filed an affidavit in support. Ex. 1 (Facebook Warrant).

### A.    The Facebook Warrant

In the affidavit in support of the Facebook Warrant, Officer Jex provided the following information: Kizzy Chapo's Facebook profile picture depicts a man wearing a mask. Ex. 1 at 002880. However, his account includes additional pictures of the same individual without a mask. *Id.* at 002880-81. Officer Jex investigated this man's identity, including by comparing the Facebook photos to prior booking photos, and discovered that the man was George Turner. *Id.* at 002881.

The Kizzy Chapo account is believed to be related to another Facebook account under the name "George Turner." *Id.* The George Turner account (1) has the same profile picture as the Kizzy Chapo account (in which the person is wearing a mask); (2) has pictures of the same individual without a mask; and (3) provides the name "Kiiz Chapo." *Id.*

There have been multiple posts on the Kizzy Chapo account related to forgery. *Id.* at 002880. A post from July 6, 2020 displays photos of several states' driver's licenses and identification cards. *Id.* at 002881. With this photo, the poster wrote:

> Need a drivers license!? Look no further. How do I do it? These drivers license pass every single test possible in any state. From holograms to microprint, from UV to scanning abilities. I prepare the IDs for every single test a bouncer or police officer has out there. They easily pass the bend test, backlight test, & several others you may have never ever heard of. How its delivered? IDs are generally crafted 4-6 days after your order has been placed, & will most likely be in your hands within 2-3 weeks of purchase. Passes the following: clubs, bars, casinos, rental cars, airports, hotels, motels, airbnbs, police traffic stops, warrants/fines, avoid jail time. Contact me for prices!! Prices vary depending on state you want. With regular shipping 2-3 weeks, rushed shipping is $40 estimated arrival: 12 days. Only accepting cash app, paypal, venmo payments.

Ex. 1 at 002881-82. Under this post were comments inquiring whether the post was real. *Id.* at 002882. Kizzy Chapo responded by posting a video of a Pennsylvania driver's license with George Turner's picture but the name Tyreik Shaamad Muhammad. *Id.* The license has an ID

number that, upon completing a records check, belongs to a woman named Natasha Reeves. *Id.* Accordingly, the driver's license depicted in the video was a forgery. *Id.*

Additionally, under the same July 6, 2020 post, Kizzy Chapo included a list of prices for the forged identification cards. *Id.* The Kizzy Chapo page also includes a post indicating what states he makes false identification cards for. *Id.* Kizzy Chapo also posted information about the process for making and distributing the forged identification cards. *Id.*

Based on all this information, Officer Jex wrote that he believed George Turner was producing fraudulent identification cards. *Id.* at 002882. As such, Officer Jex wrote, "A search warrant is being requested on the Facebook account 'George Turner' and 'Kizzy Chapo' in order to recover evidence related to the crimes of forgery and conspiracy to commit forgery." *Id.*

Officer Jex sought to seize the following categories of information from both the Kizzy Chapo and George Turner accounts:

1. Basic user identity information – The date the profile was created; First and last names provided by the user; user ID; an email address provided by the user; City, State, country; Account creation date and time; IP address at the time of sign up.

2. IP address logs – Historical IP logs from June 01, 2020 to current date.

3. Private user communications – Private in-box messages, private sent messages, and private messages in the trash folder from June 01, 2020 to current date.

4. Stored user files – photographs, videos, blogs, and classifieds.

5. Public wall messages / postings from June 01, 2020 to current date.

6. Other general information / records – Users date of birth, Gender, Hometown, Occupation, as well as historical private message header information.

7. Phone numbers associated with the account and/or profile

8. Any and all 'Facebook Messenger' application messages to include but not limited to Private in-box messages, private sent messages, and private messages in the trash folder from June 01, 2020 to current date.

*Id.* at 002879-80.

On August 4, 2020, a state court judge approved the Facebook Warrant. Ex. 1 at 002888. Officer Jex executed the Facebook Warrant and seized the categories of information enumerated

1    in the warrant. ECF No. 42-3 at 13 (Facebook Warrant return); Ex. 2 at 002790 (Residential

2    Warrant).

3        Critically, Officer Jex seized all the data identified above. Ex. 2 at 002790. As discussed

4    below, this data included evidence related to other potential crimes (including illegally possessing

5    guns and drugs), which was later included in the Residential Warrant application.

6        **B.**      **The Residential Warrant**

7        Based on the information Officer Jex obtained from the Facebook Warrant, he applied for

8    a search warrant for George Turner's home (the Residential Warrant) on November 7, 2020. Ex.

9    2.

10        In the affidavit in support of the Residential Warrant, Officer Jex explained that he

11    previously obtained a search warrant to seize certain information from Facebook for the profiles

12    of Kizzy Chapo and George Turner. *Id.* at 002788-90. Officer Jex then detailed some of the

13    information he obtained from the Facebook Warrant. As discussed below, execution of the

14    Facebook Warrant revealed evidence of forgery-related crimes, firearm-related crimes, and drug-

15    related crimes. *See* Ex. 2.

16             **i.**      **Forgery-Related Evidence**

17        Reviewing Turner's private messages, Office Jex discovered forgery-related evidence. On

18    July 7, 2020, a woman named Bennett messaged Turner. *Id.* at 002790. Turner and Bennett

19    communicated from July 7, 2020 to August 2, 2020 about Bennett obtaining Arizona and

20    California identification cards. *Id.* at 002790-92. Bennett stated that she wanted a vertical, Arizona

21    ID and Turner responded, "Why would you risk them finding out you have a fake ID just because

22    you want it vertical?" *Id.* at 002790. Turner further stated that he was trying to prevent Bennett

23    from going to jail, and "[t]his is an illegal service & you gotta be smart when using these ID[s]."

24    *Id.* at 002791. On July 29, Bennett sent Turner payment for an ID and (at some point) information

25    she wanted on the ID. *Id.* at 002791-92. Turner then explained that the ID would arrive in a package

26    from China. *Id.* at 002792.

27        On July 26, 2020, a person under the Facebook profile name Keyarea Moore messaged

28    Turner about the IDs and whether they were a scam. *Id.* at 002792. Turner responded by stating

that it was not a scam and that it was "an illegal service." *Id.* at 002793. Turner went on to explain how the process works (and specifically, that if you use a person's name that has not been "processed" by police, police will not find you in their system). *Id.*

On July 27, 2020, a person under the Facebook profile Jada contacted Turner and asked if the licenses were legal. *Id.* Turner responded, "It's a fake drivers license." *Id.*

On October 6, 2020, Turner posted a Facebook story on his "George Turner" account. *Id.* at 002796. The story included several statements, including "Who needs help getting a drivers license? These drivers license pass every single test possible in any state." *Id.* The post goes on to detail which tests the licenses pass (e.g., holograms, microprint, etc.) at which places (e.g., clubs, bars, casinos, etc.). *Id.* Turner also re-posted photos about ordering IDs. *Id.*

On October 15, 2020, Turner posted an advertisement depicting several IDs. *Id.* Officer Jex performed a record check on three California IDs, which showed that the driver license identification numbers did not match the subject depicted (i.e., the licenses were fake). *Id.* at 002796-97.

Based on this evidence, Officer Jex wrote that he believed Turner committed the crime of conspiracy to commit forgery in violation of NRS 205.090. *Id.* at 002793. Officer Jex also wrote that he believed Turner committed the crime of possessing a document or personal identity information to commit forgery/counterfeiting in violation of NRS 205.465. *Id.* at 002794.

### ii.    Firearm-Related Evidence

On February 19, 2020, Turner posted a picture on Facebook of two handguns inside what appeared to be a firearm store. *Id.* at 002798. Turner wrote "Bae wya [where you at] Im [sic] tired of buying guns off the street." *Id.*

On May 14, 2020, Turner was arrested for being a prohibited person in possession of a firearm. *Id.* at 002797.

On July 25, 2020, Turner privately messaged on Facebook with an individual named Lepatrick Featherson about firearms. *Id.* at 002798. Turner wrote, "I need one to keep in the crib . . . ." *Id.* at 002798-99. Featherson responded, "gotta get camera's [sic] and you gotta get a

piece on GP." *Id.* at 002799. Turner responded, "Yes bro I'm working on it now[.] I wanna get a Glock and get these cameras installed this week." *Id.*

Based on the above, (on November 7, 2020) Office Jex stated that he had "reason to believe that Turner may be in possession of another firearm." *Id.*

### iii.    Drug-Related Evidence

On October 16, 2020, Turner posted two videos on one of his Facebook accounts. *Id.* at 002800. These videos appeared to advertise marijuana for sale. *Id.* Turner also posted a photo that depicted over 50 pills of what appeared to MDMA or "Molly" with the slang "Tapin," which indicates that others should contact him. *Id.* at 002800-01. Based on this, Officer Jex wrote that he has reason to believe that Turner possessed narcotics with the intent to sell. *Id.* at 002801.

### iv.    Items to be Seized

Based on the above information provided in the Residential Warrant application, Officer Jex sought to seize several categories of information from Turner's home, including evidence related to drugs, firearms, and forgery-related crimes. *Id.* at 002783-86.

A state court judge signed the Residential Warrant on November 7, 2020. *Id.* at 002782.

### v.    Execution of the Residential Warrant, Arrest, and Indictment

The Residential Warrant was subsequently executed. Among other items, a firearm and a box of ammunition were found.[1]

Turner was indicted on two counts: being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and being a felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). ECF No. 1 (indictment).

Turner now moves to suppress the firearm, the ammunition, and statements he made to police. ECF No. 42 at 18.

---

[1] The arrest report was attached as an exhibit to Turner's motion and indicates that the firearm was found in the broiler drawer of the oven and the ammunition was in a cabinet above the sink. *Id.* ECF No. 42-4 at 5. However, this arrest report was *not* admitted into evidence, and no evidence was offered on where the gun and ammunition were located.

1

**III.    The Parties' Arguments**

2

    **A.    Turner's Opening Brief**

3

    Turner argues that LVMPD violated his Fourth Amendment rights by executing two

4

invalid search warrants, the Facebook Warrant and the Residential Warrant. ECF No. 42 at 7.

5

    **i.    The Facebook Warrant**

6

    Regarding the Facebook warrant, Turner argues it was invalid for two reasons. *Id.*

7

    First, Turner argues that the warrant failed to establish probable cause that evidence of a

8

forgery-related crime would be found in either the Kizzy Chapo or George Turner Facebook

9

accounts. *Id.* This so because, for the Kizzy Chapo account, Officer Jex relied on a post and

10

accompanying video advertising the sale of IDs without verifying whether the post was authentic.

11

*Id.* at 9, 10. For the George Turner account, Officer Jex believed it would contain forgery-related

12

evidence merely because it had the same profile picture as the Kizzy Chapo account and a similar

13

name ("Kiiz Chapo"). *Id.* at 10-11. Further, Officer Jex could have done more to corroborate the

14

alleged forgery but failed to do so. *Id.*

15

    Second, Turner argues that the Facebook Warrant was overbroad because it failed to limit

16

what could be seized to just forgery-related evidence. *Id.* at 7. Instead, the warrant allowed

17

LVMPD to search and seize all data and information, even if it was wholly unrelated to forgery.

18

*Id.* at 12-13. Additionally, because the warrant allowed LVMPD to search George Turner's

19

account (with no evidence it was involved in the forgery scheme), it was akin to a "general

20

warrant that allowed unfettered rummaging through Mr. Turner's personal data." *Id.* at 13-14.

21

    **ii.    The Residential Warrant**

22

    Regarding the Residential Warrant, Turner also makes two arguments regarding why it

23

was invalid. *Id.* at 7. First, Turner argues that because the evidence seized from Facebook was

24

illegally obtained, this evidence could not be used by LVMPD to obtain the Residential Warrant.

25

*Id.* at 7. Second, Turner argues that the Residential Warrant lacked probable cause to believe

26

firearm-related evidence would be in his home. *Id.*

27

28

1

### iii.    The Good Faith Exception

2          Turner also argues that the good faith exception does not apply. *Id.* at 16-17. Specifically,

3 he argues that an officer's good faith reliance on a warrant that is subsequently invalidated does

4 not save it when, as is applicable here, (1) the supporting affidavit is so lacking in probable cause

5 that the officer's belief in it is unreasonable; and (2) the warrant is so facially deficient in failing

6 to specify the place to be searched or the things to be seized that an officer cannot reasonably

7 presume the warrant to be valid. *Id.* at 17. Turner argues that both warrants lacked probable

8 cause, and the Facebook Warrant failed to specify the items to be seized such that LVMPD could

9 not reasonably presume the warrant was valid. *Id.*

10          Based on these arguments, Turner argues that all evidence seized under both warrants

11 (including the firearm, ammunition, and Turner's statements to police) must be suppressed. *Id.* at

12 7.

13    **B.    The Government's Response**

14          The government opposes Turner's motion. ECF No. 46.

15         **i.    The Facebook Warrant**

16          First, the government argues that there was probable cause to obtain the Facebook

17 warrant, especially under the deferential standard that this Court must apply when reviewing

18 warrants issued by other judges. *Id.* at 9. The government summarizes the evidence upon which

19 Officer Jex relied to obtain the Facebook warrant and argues that he was not required to further

20 investigate, as the Kizzy Chapo account was openly advertising fake IDs for sale. *Id.* at 9-10.

21 Regarding the George Turner account, the government argues that Officer Jex believed the two

22 accounts were related because they had the same profile picture, the name on the George Turner

23 account was "Kiiz Chapo," and the Kizzy Chapo account posted a video that included a

24 photograph of Turner. *Id.* at 11. The government concludes that the search of George Turner's

25 account was "necessary and entirely appropriate in an effort to identify the account holder of the

26 related 'Kizzy Chapo' account." *Id.* The government also argues in the alternative that if there

27 was no probable cause to search the George Turner Facebook account, the Court can excise that

28

portion of the search warrant (as the return from the Kizzy Chapo Facebook account provided probable cause to obtain the Residential Warrant). *Id.* at 11, n.12.

Second, the government argues that the Facebook Warrant was sufficiently particular. *Id.* at 12. The government argues that the warrant was limited to information for which Officer Jex had probable cause: information related to (1) the identity of the account holder and (2) forgery. *Id.* at 17. The government argues it would have been impossible for Officer Jex to narrow his request for messages to only those about fake IDs. *Id.* at 14-15. The government also asserts that the Ninth Circuit has rejected arguments that searches need to be narrowed by search terms and that Facebook does not search through content to determine if it is responsive to warrants. *Id.* at 16.

Third, the government argues that even if the Facebook Warrant lacked probable cause, it was not so lacking such that it rendered the officer's belief in it unreasonable. *Id.* at 18-20. Thus, the good faith exception applies. The government also argues that the warrant was not so facially deficient (in failing to particularize the place to be searched and the things to be seized) that officers could not reasonably presume the warrants to be valid. *Id.* at 19-20. The government did not elaborate much on this point, except to say that the warrant here was narrower than the one at issue in *United States v. Blake*, 868 F.3d 960, 974-75 (11th Cir. 2017), because it was temporally limited in this case. *Id.* at 20.

### ii.    The Residential Warrant

The government argues that based on the Facebook Warrant return, there was probable cause to obtain a search warrant for Turner's home related to crimes of forgery and being a felon in possession of a firearm. *See id.* at 20. The government notes that even though the messages related to firearms that Officer Jex discovered were unrelated to the forgery crimes he was investigating, they could be seized under the plain view doctrine. *Id.* at 21, n. 17.

The government also argues that even if there was no probable cause to search Turner's home for firearm-related evidence, the good faith exception applies. *Id.* at 21. The government argues that the search warrant was not so lacking in probable cause to make officers' reliance on it unreasonable. *Id.* at 21-22.

The government also argues that the doctrine of inevitable discovery applies in this case. *Id.* at 22-23. The government essentially argues that the warrant was supported by probable cause to search Turner's home for forgery-related evidence, even if there was no probable cause to search for firearms. *Id.* The government concludes that even if the warrant did not authorize officers to search for firearms, "law enforcement officers would have inevitably discovered the firearm in their search because a firearm is much larger than an identification card." *Id.* at 23. Accordingly, the government concludes that Turner's motion to suppress should be denied.

### C.    Turner's Reply

In reply, Turner reiterates some of the same arguments he made in his motion. ECF No. 47. Turner argues that LVMPD did not have probable cause to obtain the Residential Warrant. *Id.* at 6-8. Turner argues that Officer Jex had no information that drug-related evidence would be in Turner's home. *Id.* at 6. Turner further argues that Officer Jex had no information that forgery-related evidence would be in Turner's home, as none of the evidence gathered from Facebook demonstrated that people could come to Turner's house to obtain a fake ID. *Id.* Finally, Turner argues that none of the Facebook evidence suggested that Turner would possess a firearm at his home at the time the search warrant was executed in November 2020. *Id.* at 6-7.

Turner also argues that the doctrines of good faith and inevitable discovery do not apply. *Id.* at 8. First, Turner reiterates the same argument he made in his motion regarding the good faith exception. *Id.* Second, Turner argues that it is the government's burden to prove that the firearm would have been inevitably discovered, and the government cannot carry this burden. *Id.* This is so, according to Turner, because assuming the government was only searching for forgery-related evidence, they would not have searched the place where the firearm and ammunition were found—in a kitchen cabinet and inside the oven's broiler drawer. *Id.* at 9. Accordingly, Turner argues that the firearm, ammunition, and statements Turner made to police must be suppressed. *Id.* at 10.

### IV.    Analysis

The Fourth Amendment provides,

1
2
3

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

4
5
6

U.S. CONST. AMEND. IV. In other words, and as explained in more detail below, a warrant must (1) be supported by probable cause and (2) specifically describe both the place to be searched and what is to be seized.

7
8

### A.    Whether Probable Cause Existed to Obtain the Facebook Warrant

9
10
11

"Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006); *see United States v. SDI Future Health, Inc.*, 568 F.3d 684, 703 (9th Cir. 2009) (providing same rule).

12
13
14
15
16
17
18
19

The defendant bears the burden of showing that a regularly-issued search warrant was not supported by probable cause. *Chin Kay v. United States*, 311 F.2d 317, 321 (9th Cir. 1962). Further, an issuing-judge's probable cause determination is entitled to deference, and a reviewing court may "not find a search warrant invalid so long as the issuing judge had a substantial basis for concluding that the supporting affidavit established probable cause." *United States v. Flores*, 802 F.3d 1028, 1043 (9th Cir. 2015); *see also United States v. Schesso*, 730 F.3d 1040, 1045 (9th Cir. 2013) (articulating same standard); *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) (same).

20
21
22
23

Here, the Court finds that the issuing-judge had a substantial basis for concluding that Officer Jex's affidavit provided probable cause to search the Kizzy Chapo account but not the George Turner account. However, the George Turner portion of the search warrant (and the evidence retrieved from the George Turner account) can be severed from the Facebook Warrant.

24
25

### i.    The Kizzy Chapo Account

26
27
28

The Facebook Warrant contained posts from this account indicating that the account-operator was selling fake IDs, including by specifying that the IDs could help people avoid warrants, fines, and jail time. *See* Ex. 1 at 002881-82. Given these posts, the issuing-judge had a

1    substantial basis for concluding that a fair probability existed that evidence of a forgery-crime

2    would be found in Kizzy Chapo's Facebook account.

3         Turner does not appear to disagree that the Kizzy Chapo posts suggested the account user

4    was engaged in forgery-related crimes. *See* ECF No. 42. Rather, the essence of Turner's argument

5    is that Officer Jex should have done more to investigate before seeking a warrant. *See id.* at 9-11.

6    However, Turner does not cite any authority for the proposition that a longer or more in-depth

7    investigation was required to satisfy the Fourth Amendment. *See id.* And the standard for

8    probable cause simply asks whether "under the totality of the circumstances, 'there is a fair

9    probability that contraband or evidence of a crime will be found in a particular place.'" *Luong*,

10    470 F.3d at 902. Here, based on the facts contained in the Facebook Warrant, the issuing-judge

11    had a substantial basis for concluding that a fair probability existed that evidence of a forgery-

12    crime would be found in Kizzy Chapo's Facebook account.

13         **ii.    The George Turner Account**

14         Regarding the George Turner Facebook account, the Court finds that the issuing-judge did

15    not have a substantial basis for concluding that the supporting affidavit established probable cause

16    to believe "contraband or evidence of a crime" would be found in this account. *See Flores*, 802

17    F.3d at 1043 (providing standard under which court must review an issuing-judge's probable

18    cause determination); *Luong*, 470 F.3d at 902 (defining probable cause). The government

19    acknowledges that "there were no posts related to forgery by the 'George Turner' account noted

20    in the affidavit . . . ." ECF No. 46 at 11. The government's only argument regarding why it was

21    acceptable to search George Turner's account is that it was "necessary and entirely appropriate"

22    to identify the account holder of the Kizzy Chapo account, since the two accounts appeared to be

23    related. *Id.* As explained below, the Court is unconvinced by the government's argument,

24    especially as it was not developed with citation to authority.

25         First, the question is not whether a search is "necessary" or "appropriate" but rather

26    whether there is a fair probability that "contraband or evidence of a crime" will be found in a

27    particular place. *See Luong*, 470 F.3d at 902. And, critically, the government concedes that

28

1    Officer Jex's affidavit had no information about George Turner's account containing contraband

2    or evidence of a forgery-related crime. ECF No. 46 at 11.

3            Second, the government has not explained if or how someone's identity can be

4    "contraband or evidence of a crime." *See id.* Indeed, the government cites no authority for its

5    argument that it could search George Turner's account to discover the identity of the Kizzy

6    Chapo account holder.[2] *See id.* While the Court is aware that the Ninth Circuit has upheld

7    provisions of search warrants allowing the government to seize documents that show who

8    controls, possesses, or owns the property that is the subject of a search warrant, it is unclear if the

9    government may obtain a warrant solely to obtain someone's identity, independent of having

10   probable cause to search for contraband or evidence of a crime. Accordingly, without more from

11   the government, the Court cannot accept its argument that it could search George Turner's

12   Facebook account (including private messages, photos, videos, blogs, classifieds, etc.) solely to

13   determine the identity of the Kizzy Chapo account holder, which, in any event, the government

14   appears to have already had.

15                   **iii.    Severance**

16           The government notes that if the Court determines that there was no probable cause to

17   search George Turner's Facebook account, it may sever it from the rest of the warrant (and the

18   evidence obtained from George Turner's account in the Residential Warrant). ECF No. 46 at 11,

19   n.12. Turner did not respond to this argument in writing and only briefly noted at oral argument

20   that it did not know if the Court could sever warrants (when they are overbroad). *See* ECF No. 47;

21   ECF No. 54 at 56 (transcript of oral argument).

22           Severance is appropriate here. The Ninth Circuit has "embraced the doctrine of severance,

23   which allows us to strike from a warrant those portions that are invalid and preserve those

24   portions that satisfy the Fourth Amendment. Only those articles seized pursuant to the invalid

25   portions need be suppressed." *Flores*, 802 F.3d at 1045; *see also United States v. Spilotro*, 967

26   (9th Cir. 1986) ("In this circuit we follow the rule that where invalid portions of a warrant may be

27
---
[2] The Court also notes that in the Facebook Warrant, Office Jex had already identified the person depicted in the
28   Kizzy Chapo profile picture as George Turner (and had his date of birth and social security number). Ex. 1 at
     002880-81.

stricken and the remaining portions held valid, seizures pursuant to the valid portions will be sustained."). Severance requires that the invalid portions be identifiable and capable of severance from the valid portions. *See Spilotro*, 800 F.2d at 967. Here, the portion of the Facebook Warrant authorizing officers to search and seize the George Turner account information is identifiable and capable of severance from the Kizzy Chapo portion of the warrant. Accordingly, here, the Court will sever the information obtained from the George Turner Facebook account from the Residential Warrant for purposes of the rest of its analysis.

### B.    Whether the Facebook Warrant was Overbroad

#### i.    The Fourth Amendment's Specificity Requirement

The Fourth Amendment requires that a warrant specifically describe both the place to be searched and the person or things to be seized. *Id.* at 963. The Ninth Circuit describes this requirement as one of "specificity" and has "distinguished its 'two aspects': 'particularity and breadth . . . Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *SDI*, 568 F.3d at 702.

Here, Turner argues that the Facebook Warrant was overbroad because it failed to limit what could be seized to evidence of the suspected crimes and allowed officers to engage in an unfettered rummaging through Turner's personal data. ECF No. 42 at 7, 11-14.

The Court considers three factors in analyzing whether a warrant is overbroad: "(1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available . . . ." *Flores*, 802 F.3d at 1044.

#### ii.    What Documents Constitute "the Warrant"

Before the Court can analyze the breadth of a warrant, however, the Court must first determine what documents make up "the warrant." More specifically, the Court must address whether other documents, such as an affidavit, are a part of "the warrant." *See SDI*, 568 F.3d at

699 (before addressing whether the warrant is overbroad, "we must answer the threshold question of whether the warrant incorporated [the agent's] affidavit."); *United States v. Towne*, 997 F.2d 537, 544 (9th Cir. 1993) ("Only after the content of 'the search warrant' is established . . . can the warrant be tested to see if it meets [the Fourth Amendment's] requirements.").

In *Towne*, the Ninth Circuit confronted the question, "what is a search warrant?" 997 F.2d at 539. More specifically, the Court discussed when documents submitted with a search warrant (e.g., an affidavit or exhibit) may be considered as part of the actual warrant for purposes of construing the warrant. *See Towne*, 997 F.2d 537. The court held that for another document to be considered part of the search warrant, it must be (1) incorporated by reference to the search warrant and (2) accompany the search warrant both when it is authorized by the judge and when the search warrant is executed. *See id.* at 547-48; *see also SDI*, 568 F.3d at 699 ("We consider an affidavit to be part of a warrant, and therefore potentially curative of any defects, 'only if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search.'"). The Ninth Circuit noted that it remains "'rigid' in [its] insistence on both these requirements" to "assure that the affidavit actually limits the 'discretion of the officers executing the warrant.'" *Towne*, 997 F.2d at 548.

Here, the warrant expressly incorporated the affidavit by reference (Ex. 1 at 002886), but there was no evidence that the affidavit accompanied the warrant while the search was executed.[3] Accordingly, it was not established that the affidavit was part of the Facebook Warrant (and thus could be used to narrow it) under controlling Ninth Circuit law.

That said, neither party explicitly addressed this issue. The government appears to assume that Officer Jex's affidavit is part of the Facebook Warrant, and Turner's position is unclear. Because it does not change the Court's conclusion, the Court treats Officer Jex's affidavit as

---

[3] Additionally, it is not clear to the Court if Officer Jex was the only officer who reviewed the data seized from Facebook or if other officers searched the data, too. Officer Jex noted in the Residential Warrant application that he believed the Facebook Warrant would "allow *officers* to retrieve evidence of the conspiracy." Ex. 2 at 002788 (emphasis added).

being incorporated into the Facebook Warrant for purposes of its analysis and concludes that certain categories in the Facebook Warrant are overbroad.

### iii.    How an Affidavit Affects the Breadth of a Warrant

When an affidavit is incorporated into a warrant, courts may consider the affidavit and the warrant as a whole, and the affidavit may cure deficiencies in a "naked" warrant. *SDI*, 568 F.3d at 699. The Ninth Circuit, however, does not appear to have provided any clear test for determining if and how an affidavit cures an otherwise deficient warrant. Still, there are instructive Ninth Circuit cases on how an affidavit may or may not cure a deficient warrant.

The Ninth Circuit's first "detailed examination of the cure-by-affidavit rule came in *In re Property Belonging to Talk of the Town Bookstore, Inc.*, 644 F.2d 1317 (9th Cir. 1981)," and it provides an easy example of how the rule can work. *Towne*, 997 F.2d at 545. In that case, the *warrants* authorized officers to seize certain property "described in the Affidavits." 644 F.2d at 1319. The *affidavits*, in turn, described the property to be seized in detail. *Id.* Accordingly, the Ninth Circuit held that the "warrants expressly limited the property subject to seizure to that described in detail in the incorporated affidavits," and as such, "any generality in the warrants was cured by the incorporation and attachment of the affidavits." *Id.*

Since *In re Property Belonging to Talk of the Town Bookstore*, the Ninth Circuit has provided other guideposts for if and how an affidavit can cure a deficient warrant. As is relevant to this case, the Ninth Circuit has held that mentioning the statute alleged to have been violated in the affidavit or even "'limiting' the search to only records that are evidence of the violation of a certain statute is generally not enough" if a more specific description of the items sought is possible. *United States v. Cardwell*, 680 F.2d 75, 77-78 (9th Cir. 1982) (holding that a search warrant that authorized the seizure of business documents that were evidence of a violation of 26 U.S.C. § 7201 was overbroad, given that the government had more information about the suspected crimes); *see also Spilotro*, 800 F.2d at 965 ("In *Cardwell* we noted that warrants reciting generic classifications and criminal statutes without more usually do not give the officers who execute them guidance to determine what items to seize.").

The Ninth Circuit has also noted several times that the government can narrow a warrant by "describing the criminal activities themselves rather than simply referring to the statute believed to have been violated." *Spilotro*, 800 F.2d at 964; *see also United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 1995) ("The government could have made the warrant more particular. Most obviously, the warrant could have specified the suspected criminal conduct.").

That said, describing the suspected criminal activity does not, by itself, prevent a warrant (including an affidavit) from being overbroad. *See SDI*, 568 F.3d 684. In *SDI*, the Ninth Circuit analyzed whether the warrant incorporated the affidavit and concluded that it did. *Id.* at 699-701 ("[T]he warrant did incorporate the affidavit."). The search warrant affidavit detailed the suspected criminal conduct (healthcare-related fraud and tax fraud) and provided twenty-four categories of items to be seized. *Id.* at 691-92. Still, as discussed below, the Ninth Circuit found that some categories were overbroad. *Id.* at 702-05.

On the one hand, the Court found certain categories of information were not overbroad. The affidavit explained how the government believed SDI conspired with doctors and other medical companies to defraud Medicare, insurers, and others, and how SDI committed tax fraud. *Id.* at 691-92. SDI's entire business consisted of conducting sleep studies, and SDI's alleged fraudulent conduct was routine. *Id.* at 703. Based on those facts, the Ninth Circuit found that, for example, the category "[d]ocuments related to billing records and records of payments received" was not overbroad. *Id.* at 703-04. The Ninth Circuit reasoned that because the affidavit alleged that SDI engaged in both tax fraud and Medicare fraud, there was probable cause to seize all these billing documents. *Id.* at 704. The Ninth Circuit also reasoned that the category "[d]ocuments relating to correspondence with Medicare intermediaries and private insurance companies" was not overbroad even though the government did not limit it to those documents related to sleep studies, because the affidavit made clear that SDI's entire business was conducting sleep studies. *See id.*

On the other hand, the Ninth Circuit found that certain categories of information were overbroad, despite the affidavit's incorporation. For example, the court held that the category, "[d]ocuments relating to non-privileged internal memoranda and Email" was overbroad. *Id.* at

704-05. The court reasoned that these documents typically contain a wide range of subject matters not necessarily related to sleep studies (let alone the alleged criminal conduct). *See id.* The court noted that this category "constitutes an invitation to a general, 'exploratory rummaging in a person's belongings.'" *Id.* Similarly, the court held that the categories, "[d]ocuments relating to bank accounts, brokerage accounts, trusts," "[c]hecking, savings, and money market account records, including check registers, cancelled checks, monthly statements, wire transfers, and cashier's checks," and "[d]ocuments relating to personnel and payroll records" were overbroad. *Id.* The court noted that companies keep many financial documents and information of employees' and thus, without making these categories more specific, "the warrant provided the search team with discretion to seize records wholly unrelated" to SDI's finances or the alleged crimes. *See id.* at 705. Finally, the court found the category "[r]olodexes, address books and calendars" to be "the laziest of gestures in the direction of specificity . . . this category practically begs the search team to find and to seize the contact information of every person who ever dealt with SDI." *Id.* at 705. The court further provided that this category could have and should have been limited to the information of people likely related to the conspiracy (e.g., consultants, doctors, etc. even if not named individually). *Id.* At bottom, the court's reasoning in *SDI* makes clear that even if an incorporated affidavit describes the suspected criminal conduct, the warrant may still be overbroad depending on the breadth of the categories of items to be seized.

### iv.     The Breadth of the Facebook Warrant

Here, the Court finds that certain categories in the Facebook Warrant were overbroad. As discussed below, the Court applies the three-part test for analyzing overbreadth and considers Officer Jex's affidavit as part of the warrant for purposes of its analysis. *See Flores*, 802 F.3d at 1044 (courts must consider three factors in analyzing whether a warrant is overbroad: "(1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available . . . .").

1    First, probable cause did not exist to seize all items of each category described in the

2    warrant.

3    As previously noted, the warrant authorized Officer Jex to seize the following categories

4    of information from the Kizzy Chapo account:[4]

5    
6    1.  Basic user identity information – The date the profile was created; First and last
        names provided by the user; user ID; an email address provided by the user;
7        City, State, country; Account creation date and time; IP address at the time of
        sign up.

8    2.  IP address logs – Historical IP logs from June 01, 2020 to current date.

9    3.  Private user communications – Private in-box messages, private sent messages,
        and private messages in the trash folder from June 01, 2020 to current date.
10

11   4.  Stored user files – photographs, videos, blogs, and classifieds

12   5.  Public wall messages / postings from June 01, 2020 to current date.

13   6.  Other general information / records – Users date of birth, Gender, Hometown,
        Occupation, as well as historical private message header information.
14

15   7.  Phone numbers associated with the account and/or profile

16   8.  Any and all 'Facebook Messenger' application messages to include but not
        limited to Private in-box messages, private sent messages, and private messages
17       in the trash folder from June 01, 2020 to current date.

18   Ex. 1 at 002886-87.

19   The Court finds that there was probable cause to seek the identity-related categories of

20   information (categories 1, 2, 6 [minus historical private message header information], and 7). The

21   Ninth Circuit has long held that officers may properly seek information to identify the person who

22   controls the place to be searched. *Ewing v. City of Stockton*, 588 F.3d 1218, 1229 (9th Cir. 2009)

23   ("[T]his court has long upheld warrants containing such language.").

24   There was not, however, probable cause to seek all items in the remaining categories (3, 4,

25   5, 6 [as it relates to historical private message header information only], and 8). *See Flores*, 802

26   F.3d at 1044 (the first factor to consider in analyzing overbreadth is whether probable cause

27   
28   
_____

[4] The Court will not analyze whether the Facebook Warrant was overbroad as it relates to searching George Turner's Facebook account, as the Court already found that there was not probable cause to search George Turner's account and severed that portion of the warrant.

existed to seize all items of a category described in the warrant). These categories request private inbox messages, private sent messages, private messages in the trash folder, photographs, videos, blogs, classifieds, public wall messages/postings, private message header information, and all Facebook Messenger application messages from June 1, 2020 to August 4, 2020. Ex. 1 at 002886-87. No other limitations were place on what could be seized in these categories. *See id.* There was no probable cause to seize all this information, much of which may have contained innocent information related to Turner and third parties. *See Kow*, 58 F.3d at 427 ("The government emphasizes that the warrant outlined fourteen separate categories of business records. However, the warrant contained no limitations on which documents within each category could be seized . . . By failing to describe with any particularity the items to be seized, the warrant is indistinguishable from the general warrants repeatedly held by this court to be unconstitutional."); *SDI*, 568 F.3d at 704-05 (finding several categories of documents [e.g., memos and emails] to be overbroad because such documents typically contain a wide range of subject matters not necessarily related to the suspected criminal activity).

Second, for these problematic categories, the warrant did not set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not. *See* Ex. 1; *Flores*, 802 F.3d at 1044 (the second factor courts must consider in analyzing whether a warrant is overbroad is whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not).

Third, the government could have described the items in the Facebook Warrant more particularly in light of the information available. *See id.* (the third factor courts must consider in analyzing whether a warrant is overbroad is whether the government could have described the items more particularly given the available information). All the problematic categories could and should have been more limited based on what Officer Jex knew at the time he requested the Facebook Warrant. Specifically, Officer Jex had information that Turner appeared to be engaged in the advertisement and sale of fake licenses and identification cards. *See* Ex. 1. Accordingly, the categories listed above could have been limited, for example, by specifying that the documents or data sought (messages, blogs, videos, etc.) had to be related to licenses or identification cards.

Instead, Categories 3, 4, 5, 6 (related to private message header information), and 8, as written, invite officers to seize all private user communications, all public wall messages and postings, all private message header information, and all Facebook Messenger messages, regardless of whether the information relates to the suspected crimes or is innocent and personal. Like the categories of information the Ninth Circuit found to be overbroad in *SDI*, these categories "constitute an invitation to a general, exploratory rummaging in a person's belongings," which is exactly what occurred. *See SDI*, 568 F.3d 704-05 (cleaned up).

Accordingly, under the three-part test for overbreadth that this Court must apply, Categories 3, 4, 5, 6 (related to private message header information only), and 8 are overbroad. Even under the deferential standard this Court must apply to the issuing-judge's decision, the Court finds that these categories were so overbroad that the issuance of the warrant was clear error; these categories are, on their face, completely untethered from any suspected criminal activity. *See United States v. Bridges*, 344 F.3d 1010, 1014 (9th Cir. 2003) (issuance of a search warrant reviewed for clear error).

This Court recognizes that the Ninth Circuit permits over-*collecting* of electronic data (to determine where responsive information is stored) but critically, the Ninth Circuit does not allow over-seizing/usage of information for which the government does not have probable cause. *See Flores*, 802 F.3d at 1044–45 (over-collecting "is an accepted reality in electronic searching because '[t]here is no way to be sure exactly what an electronic file contains without somehow examining its contents.'"). However, the Ninth Circuit still applies the same overbreadth-analysis to search warrants for electronic data. *See id.* (applying three-factor test). For example, in *Flores*, the government obtained a search warrant to search the defendant's Facebook page. *See id.* at 1044. The Ninth Circuit applied the three-factor test and suggested that the warrant was not overbroad, even though it allowed the government to collect and search 11,000 pages of data when only 100 pages were "truly responsive" to the warrant. *Id.* Critically, the court suggested the warrant was not overbroad because it only allowed the government to keep and use evidence "tending to show narcotics trafficking," it provided objective standards for segregating this responsive material from the rest of the defendant's account, the government did not use the

1   seized data for any broader investigatory purpose, and Facebook, rather than the government,

2   segregated the defendant's account. *Id.* at 1044-45 & n.21.

3        Here, the Facebook Warrant was substantially broader than the warrant in *Flores* and did

4   not include any of the procedural safeguards the Ninth Circuit relied on to suggest that the *Flores*-

5   warrant was not overbroad. In other words, even if the government could over-collect (as

6   explained in *Flores*), the warrant would still be overbroad because (1) there was no probable

7   cause to "seize" or retain all the information received as part of the Facebook Warrant return; (2)

8   the warrant did not provide objective standards for segregating responsive material from

9   nonresponsive material; and (3) the government used the collected information for a broader

10  investigatory purpose (investigating narcotics-related and firearms-related offenses). Accordingly,

11  even considering that over-collecting "is an accepted reality in electronic searching," the

12  Facebook Warrant was still overbroad. *See Flores*, 802 F.3d at 1044–45. As the Ninth Circuit has

13  noted, "[t]he process of segregating electronic data that is seizable from that which is not must not

14  become a vehicle for the government to gain access to data which it has no probable cause to

15  collect." *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir.

16  2010).[5]

17        **C.**    **Whether the Good Faith Exception Applies to the Facebook Warrant**

18        The government argues that even if the Facebook Warrant was deficient, the good faith

19  exception applies.

20        Evidence seized pursuant to a facially valid search warrant that later is held to be invalid

21  may still be admissible, if officers acted in good faith and in reasonable reliance on the warrant.

22  *Kow*, 58 F.3d at 428. The good faith exception will not apply, however, "(1) where the affiant

23  recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2)

24  _____

25  [5] Because the Court finds that the Facebook Warrant was overbroad with regard to the substantive categories discussed above, the Court need not reach whether officers could have seized evidence related to firearms offenses under the plain view doctrine, as the government argued. *See* ECF No. 46 at 21, n.17. The Supreme Court has limited

26  the application of the plain view doctrine to situations where the officer had a legal right to be at the location from which the object was plainly viewed. *Horton v. California*, 496 U.S. 128, 136 (1990). Here, the only reason Officer

27  Jex was able to see information regarding firearms was because of the illegal overbreadth of the Facebook Warrant. Additionally, the Court notes that even assuming *arguendo* that the Facebook Warrant was not overbroad, the Ninth Circuit has cautioned "against retaining unresponsive data based on the 'plain view' doctrine" so that necessary over-

28  collecting of data does not violate the Fourth Amendment. *See Flores*, 802 F.3d at 1045.

1    where the judge 'wholly abandon[s] his [or her] judicial role'; (3) where the affidavit is 'so

2    lacking in indicia of probable cause as to render official belief in its existence entirely

3    unreasonable'; and (4) where the warrant is 'so facially deficient—i.e., in failing to particularize

4    the place to be searched or the things to be seized—that the executing officers cannot reasonably

5    presume it to be valid.'" *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013).

6         "The government bears the burden of proving that reliance upon the warrant was

7    objectively reasonable." *Kow*, 58 F.3d at 428; *see also United States v. Camou*, 773 F.3d 932, 944

8    (9th Cir. 2014) ("The burden of demonstrating good faith rests with the government.").

9         Turner argues that the good faith exception does not apply because the Facebook Warrant

10   was so facially deficient in failing to particularize the items to be seized that LVMPD could not

11   have reasonably presumed it to be valid (exception "4" above). ECF No. 42 at 17; ECF No. 47 at

12   8. The government responds by arguing that the Facebook Warrant in this case is narrower than a

13   broad Facebook warrant upheld under the good faith exception in *United States v. Blake*, 868

14   F.3d 960, 974-75 (11th Cir. 2017). ECF No. 46 at 20.

15        In the Ninth Circuit, "[a]s a rule," if a warrant is facially defective because it is overbroad,

16   "an objectively reasonable belief in its validity will be impossible . . . ." *Towne*, 997 F.2d at 549.

17   This is so because "officers attempting to execute a warrant so facially overbroad that it precludes

18   reasonable reliance will recognize, even after the warrant leaves the hands of the magistrate, that

19   it fails to offer guidance." *Id.* The Ninth Circuit has further explained that "[r]equiring that an

20   officer know when a warrant is facially overbroad to this degree presents little burden." *Ortiz v.*

21   *Van Auken*, 887 F.2d 1366, 1370 (9th Cir. 1989). Accordingly, the Ninth Circuit is "vigilant in

22   scrutinizing officers' good faith reliance on such illegally overbroad warrants." *Id.*; *see also*

23   *United States v. Stubbs*, 873 F.2d 210 (9th Cir. 1989) (good faith exception inapplicable to

24   overbroad warrant that lacked probable cause to seize all documents allowed to be seized, did not

25   provide objective standards by which executing officers could determine what could be seized,

26   and should have been more specific).

27        Here, the government has not carried its burden to show that the good faith exception

28   applies to the Facebook Warrant. The government has not explained why or how this case should

be an exception to the Ninth Circuit's rule that if a warrant is facially defective because it is overbroad, "an objectively reasonable belief in its validity will be impossible." *See Towne*, 997 F.2d at 549. Like in *Stubbs*, 873 F.2d 210, and as discussed above, the Facebook Warrant lacked probable cause to seize all items in the enumerated categories, did not provide objective standards by which officers could differentiate responsive items from nonresponsive items, and could and should have been more specific about which items officers were allowed to "seize" and use. Officers "attempting to execute" the Facebook Warrant should have recognized, even after the issuing judge signed it, that it failed to offer guidance on what information they could "seize" and use. *See Towne*, 997 F.2d at 549. Accordingly, the Facebook Warrant appears to squarely fit into the category of warrants that are so facially overbroad that an objective, reasonable belief in their validity is impossible. *See id.* Critically, the government has not explained why this is not so.

The government's only argument is that the Facebook Warrant is narrower than a Facebook warrant upheld under the good faith exception in *United States v. Blake*, 868 F.3d 960, 974-75 (11th Cir. 2017). ECF No. 46 at 20. There are two main problems with the government's reliance on *Blake*. First, *Blake* is an Eleventh Circuit case and is thus not controlling. Second, as discussed below, *Blake* does not support the government's position.

In *Blake*, a warrant required Facebook to *disclose* "virtually every type of data that could be located in a Facebook account." *Id.* at 966. In this way, it may have been "broader" than the Facebook Warrant in this case. Critically, however, the warrant provided that the only data that could be *seized* was data that "'constitute[d] fruits, evidence and instrumentalities' of a specified crime." *Id.* at 967. Accordingly, unlike this case, the warrant in *Blake* differentiated between what Facebook was required to disclose and what the government could seize, and limited seizure to evidence of a specified crime for which the government had probable cause. *See id.* at 966-67, 975.[6] Accordingly, *Blake* does not support the argument that the Facebook Warrant should be upheld under the good faith exception.

---

[6] In *Blake*, the Eleventh Circuit was nonetheless troubled by the extent of the *disclosure* that the warrant allowed (*id.* at 974); however, it held that whether the warrant violated the Fourth Amendment was a close enough question that officers could have relied on the warrant in good faith. *See id.* at 975.

1  **D.    Suppression of the Facebook Evidence**

2  Having concluded that categories 3, 4, 5, 6 [related to private message header

3  information], and 8 are overbroad and not subject to the good faith exception, the Court must

4  determine the appropriate remedy. As discussed below, its options are partial or total suppression

5  of the evidence obtained from the Facebook Warrant.

6  The Ninth Circuit has "endorsed a doctrine of severance, 'which allows a court to strike

7  from a warrant those portions that are invalid and preserve those portions that satisfy the Fourth

8  Amendment.'" *SDI*, 568 F.3d at 707. The Ninth Circuit permits severance "when a warrant

9  lacked particularity because of some unduly broad language in the warrant." *Id.* The doctrine

10 requires, however, that the portions to be severed be sufficiently specific and "separable from the

11 rest of the warrant to allow severance." *Spilotro*, 800 F.2d at 967. "Total suppression, on the other

12 hand, is appropriate when a warrant is wholly lacking in particularity." *Id.* Additionally, total

13 suppression is appropriate "when the valid portion of the warrant is a relatively insignificant part

14 of an otherwise invalid search." *Kow*, 58 F.3d at 428 ("severance is not available when the valid

15 portion of the warrant is 'a relatively insignificant part' of an otherwise invalid search.").

16 Here, the Court is inclined to hold that total suppression of the evidence obtained from the

17 Facebook Warrant is appropriate, because the valid portion of the warrant is a relatively

18 insignificant part of the overall warrant. The Facebook Warrant allowed officers to collect and

19 seize the eight enumerated categories of information for both the Kizzy Chapo and George Turner

20 Facebook accounts. Ex. 1. As the Court explained, there was no probable cause to search the

21 George Turner account and, as to the Kizzy Chapo account, all the substantive categories of

22 information were overbroad (3, 4, 5, 6 [related to private message header information], and 8). As

23 such, the only valid categories in the Facebook Warrant allowed officers to obtain identity-related

24 information for the Kizzy Chapo account (categories 1, 2, 6 [minus historical private message

25 header information], and 7). In the context of the entire warrant, this is a "relatively insignificant

26 part of an otherwise invalid search." *See Kow*, 58 F.3d at 428 ("severance is not available when

27 the valid portion of the warrant is 'a relatively insignificant part' of an otherwise invalid

28 search.").

However, even if the Court only partially suppressed the evidence obtained from the invalid categories (3, 4, 5, 6 [related to private message header information], and 8), as explained below, the effect on the Residential Warrant would be the same. Specifically, the Residential Warrant would allow officers to search Turner's home for forgery-related evidence.

### E.    Effect of Suppression on Residential Warrant

As explained below, there appears to be conflicting Ninth Circuit caselaw on what to do when illegally obtained evidence is included in a subsequently issued search warrant.

On the one hand, some cases suggest that the Court must (1) inquire whether the officers would have sought the search warrant if they had not first obtained the illegal evidence and if so, then (2) excise the illegally obtained information from the search warrant and determine if probable cause still exists to issue the warrant. *See, e.g.*, *United States v. Sitton*, 968 F.2d 947, 956 (9th Cir. 1992) *abrogated on other grounds* ("Because there is no evidence that the decision to seek the second warrant was prompted by the first search, the second warrant is valid if, excising the tainted statements, the untainted portions of the affidavit contain a sufficient showing of probable cause."); *United States v. Salas*, 879 F.2d 530, 537–38 (9th Cir. 1989) ("The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the magistrate *and affected his decision to issue the warrant.*); *United States v. Holzman*, 871 F.2d 1496, 1513–14 (9th Cir. 1989), *abrogated on other grounds* ("evidence would not be admissible, 'if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.'").

On the other hand, other cases suggest the courts should simply excise the illegally obtained information from the search warrant and determine if probable cause still existed to issue the warrant (without regard to whether officers would have sought the warrant absent the illegally obtained information). *See, e.g.*, *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir.

1   2001) ("Once the district court determined that the search warrant included illegally obtained

2   information, it properly purged the affidavit of the offending facts and examined whether the

3   remaining facts still afforded a substantial basis for concluding that the search warrant was

4   supported by probable cause."); *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994) ("The

5   mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the

6   evidence seized pursuant to the warrant . . . Rather, '[a] reviewing court should excise the tainted

7   evidence and determine whether the remaining untainted evidence would provide a neutral

8   magistrate with probable cause to issue a warrant.'").

9       Here, even applying the less onerous line of cases, and after the Court excises the illegally

10   obtained information from the Residential Warrant, some information would remain related to

11   narcotics, firearms, and forgery (that was obtained independent of the Facebook Warrant). As

12   discussed below, the Court concludes that after excising the illegally obtained information, there

13   would be probable cause to search Turner's home for forgery-related evidence but there would

14   not be probable cause to search for firearm-related evidence. The Court further concludes that the

15   government has not carried its burden to show that the good faith exception applies or that

16   officers would have inevitably discovered the firearm and ammunition. Accordingly, the firearm

17   and ammunition must be suppressed.[7]

### i. Forgery-Related Evidence

19       The Court finds that the affidavit filed in support of the Residential Warrant established

20   probable cause to search for, at a minimum, electronic devices containing evidence of forgery-

21   related crimes (even after the illegally obtained information is excised from the affidavit). After

22   the illegally obtained information is excised from the Residential Warrant, the Warrant still

23   contains information from the July 6, 2020 post (used to obtain the Facebook Warrant) related to

---

[7] The Court does not believe that the issuing-judge had a substantial basis for concluding that the affidavit established probable cause to search for narcotics-related evidence based on the information included in the Residential Warrant. *See Flores*, 802 F.3d at 1043 (a reviewing court may "not find a search warrant invalid so long as the issuing judge had a substantial basis for concluding that the supporting affidavit established probable cause."). The affidavit simply provided no facts to suggest Turner had narcotics-related evidence at his home (as opposed to a stash house or elsewhere). *See* Ex. 2 at 002800-01. However, the Court need not decide this issue because the Court concludes that the government has not carried its burden to show that it would have inevitably discovered the firearm and ammunition (had it been properly searching for narcotics-related evidence).

selling fake licenses and identification cards, the video of a fake Pennsylvania driver's license, a list of states for which Turner allegedly makes fake identification cards, and two Facebook stories from October 2020 related to selling fake licenses. Ex. 2 at 002787-88, 002796-97. This evidence provides a fair probability that evidence of a forgery-related crime would be found on Turner's electronic devices, and it is reasonable to infer that Turner would have his electronic devices at home. *Luong*, 470 F.3d at 902 (providing probable cause standard); *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006) ("probable cause determination may be based in part on reasonable inferences"). Accordingly, the Court concludes that even after excising the illegally obtained information from the Residential Warrant, probable cause would still exist to search Turner's home for at least some forgery-related evidence.

### ii.      Firearm-Related Evidence

After the illegally obtained information is excised from the affidavit filed in support of the Residential Warrant, there is no probable cause to search Turner's home for firearms or ammunition. Probable cause to search Turner's home for a firearm was supported by three facts in the Residential Warrant: (1) on February 19, 2020, Turner posted a Facebook story that contained a picture of two firearms inside of a firearm store with text, including "Bae wya (where you at) Im [sic] tired of buying guns off the street" (Ex. 2 at 002798); (2) on May 14, 2020, Turner was arrested for being a prohibited person in possession of a firearm (*id.* at 002797); and (3) on July 25, 2020, Turner privately messaged with someone on Facebook about needing a gun for his house and wanting to get one (*id.* at 002798-99). *See* ECF No. 46 at 20-21 (government's response brief). The private message was obtained from the Facebook Warrant (ECF No. 46 at 7, n.9) and, as discussed above, must be suppressed and excised from the Residential Warrant. Accordingly, the evidence that remains is the February 2020 picture of firearms inside a firearm store and a May 2020 arrest for being a prohibit person in possession of a firearm. These two facts do not establish a fair probability that Turner would have a firearm in his house when the Residential Warrant issued (in November 2020). *See* Ex. 2. The evidence is both thin and stale (and the arrest suggests that if Turner had a firearm, it would have been confiscated by police).

1

**F.      Whether the Good Faith Exception Applies to the Residential Warrant**

2

The government argues that even if there was no probable cause to search Turner's home

3

for a firearm, the good faith exception applies. ECF No. 46 at 21-22.

4

The Ninth Circuit has held, however, that "the good faith exception does not apply where

5

a search warrant is issued on the basis of evidence obtained as the result of an illegal search."

6

*United States v. Wanless*, 882 F.2d 1459, 1466-67 (9th Cir. 1989) ("because the search warrant

7

was issued in part on the basis of evidence obtained from an illegal search of the vehicles, the

8

'good faith' exception does not apply"); *see also Bishop*, 264 F.3d at 924, n.2 ("When the warrant

9

was secured in part on the basis of unlawfully seized evidence, the good-faith defense does not

10

apply.").

11

Here, as discussed above, the Residential Warrant was obtained, in part, based on illegally

12

obtained information from Facebook Warrant. Accordingly, the good faith exception does not

13

apply to the Residential Warrant.

14

**G.      Whether the Inevitable Discovery Doctrine Applies to the Firearm and Ammunition**

15

16

The government's final argument is that even if everything was excised from the

17

Residential Warrant except as it relates to the forgery-related crimes, the government still would

18

have inevitably discovered the firearm. ECF No. 46 at 22-23. Turner argues that it is the

19

government's burden to prove by a preponderance of the evidence that it would have inevitably

20

discovered the firearm, and the government cannot meet its burden. ECF No. 47 at 8.

21

The inevitable discovery doctrine was first recognized by the Supreme Court in *Nix v.*

22

*Williams,* 467 U.S. 431 (1984). The doctrine provides that if, "'by following routine procedures,

23

the police would inevitably have uncovered the evidence,' then the evidence will not be

24

suppressed despite any constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (9th

25

Cir. 2009); *see also United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (providing same

26

rule). The government must make this showing by a preponderance of the evidence. *Reilly*, 224

27

F.3d at 994. The government can carry its burden by offering evidence that "'by following routine

28

procedures, the police would inevitably have uncovered the evidence.'" *United States v. Lopez-Soto*, 205 F.3d 1101, 1107 (9th Cir. 2000).

Here, the government did not carry its burden to prove that the firearm and ammunition would have been inevitably discovered if police were only searching for forgery-related evidence. The government offered no evidence regarding where the firearm and ammunition were found or that officers would have inevitably discovered either by following routine procedures. *See* ECF No. 54 (transcript of evidentiary hearing); *Lopez-Soto*, 205 F.3d at 1107 (the government can carry its burden to show inevitable discovery by proving that officers would have discovered the evidence following routine procedures). No evidence was offered about routine searching procedures, where officers would have looked for forgery-related evidence, or if anything would have been different about the search had officers not been looking for firearms and/or narcotics-related evidence. *See* ECF No. 54 (transcript of evidentiary hearing); *Lopez-Soto*, 205 F.3d at 1107 (reversing district court for finding inevitable discovery doctrine applied when the government provided no evidence on what officer would have done absent the illegality); *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399-1400 (9th Cir. 1989) (government assumed that the evidence would have been inevitably discovered but "no evidence to that effect was introduced in the hearing" and accordingly, government failed to meet its burden). Accordingly, the government failed to carry its burden to prove by a preponderance of the evidence that the firearm and ammunition would have inevitably been discovered had officers only been searching for forgery-related evidence.

**V.    Conclusion**

**IT IS THEREFORE RECOMMENDED** that Defendant's motion to suppress (ECF No. 42) be GRANTED.

### NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely

objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).


        DATED: December 7, 2021.


_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE